**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**HONORA HILLIER**                                               **PLAINTIFF**

**VS**                                        **CAUSE NO. 1:08 CV 671LG-RHW**

**USAA CASUALTY INSURANCE COMPANY**                    **DEFENDANT**

**PLAINTIFF'S RESPONSE TO MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Honora Hillier and submits her Response[1] to USAA's Motion for

Partial Summary Judgment.

**_I._**              **_Prejudgment Interest_**

Prejudgment interest is due on an insurance claim recovery as of the date the

claim should have been paid. Butcher v. Allstate Ins. Co., 2009 U.S. Dist. LEXIS 105353

S.D. Miss. (Oct. 22, 2009).  "The applicable statute for pre-judgment interest is § 75-17-1

of the Mississippi Code of 1972. It states: '[t]he legal rate of interest on all notes,

accounts and contracts shall be 8% per annum, calculated according to the actuarial

method....'  Section 75-17-1(1) is the authority for 8% interest that begins no earlier than

the date of damages and ends at judgment." Id.  Accordingly, USAA owes interest on

Honora Hillier's insurance proceeds from the date that USAA should have paid the claim.

USAA should have fully paid Hillier's claim no later than the time that Hillier

submitted to USAA the report of KCE Matrix (discussed below) which established that

the wind damage which Hurricane Katrina caused to Hillier's insured property exceeded

policy limits.  The date of the KCE Matrix report is March 20, 2006. *See* Exhibit F.

---

[1] Since the pertinent authorities are cited herein, it is requested that the requirement of a separate
memorandum be waived.

## II.    *Bad Faith*

There is a genuine issue of material fact as to whether USAA acted in bad faith in denying Honora Hillier the limits of her insurance policy for the total loss of her home during Hurricane Katrina. USAA did not have an arguable, good-faith basis for failing to pay Honora Hillier for the destruction of her home by wind.  In making only partial payments, USAA relied on engineering reports which were not based on substantial facts.

Under Mississippi law, "[a]n insurance company must present an arguable, good-faith basis for denial of a claim . . . Insurance companies are not free to employ [experts] who are in a position to recommend arbitrary denials."  United Am. Ins. Co. v. Merrill, 978 So.2d 613, 627 (Miss. 2007).  An unsubstantiated expert opinion is not an arguable, good-faith basis for denial of a claim. Id.

In Merrill, a cardiologist employed by a life insurance company wrote a report stating that the deceased had died of congestive heart failure, an excluded condition. Id. The cardiologist had never examined the deceased and the medical records did not state the diagnosis of congestive heart failure. Id. The Mississippi Supreme Court, in upholding the award of punitive damages, ruled that the insurance company could not rely on the opinions of experts if those opinions were not substantiated by facts. Id.

In this case, USAA relied on unsubstantiated engineering reports as the basis for its denial of Hillier's claim.  USAA hired two engineering companies to determine the cause of the total destruction of Honora Hillier's residence during Hurricane Katrina --- Haag Engineering Company and EFI Global.  Both Haag and EFI Global wrote reports

incorrectly opining that the storm surge destroyed the Hillier residence prior to the arrival of peak winds at the property.

Both Haag and EFI Global also stated that, judging by the damage to other structures in the area which survived the storm, and the fact that the residence had survived prior hurricanes, Katrina's winds were not strong enough to destroy the residence, anyway.

Honora Hillier hired her own engineering company, KCE Matrix, which provided a report to USAA correctly pointing out that Katrina's peak winds battered the Hillier residence for three hours prior to the arrival of the storm surge on the property. USAA's own meteorologists proved that KCE Matrix was right on that point and that Haag and EFI Global were incorrect.

KCE Matrix also pointed out in its report that that the age and construction of the residence made it especially susceptible to Hurricane Katrina's winds. USAA's experts admitted that they did not know the wind speeds at the Hillier property during prior hurricanes and that, due to the age of the residence, the house was likely not constructed to withstand strong winds.

KCE Matrix also pointed out the flaws in the methodology used by Haag and EFI Global in determining the strength of Katrina's winds by observing wind damage to structures in the area which survived the storm. USAA itself had specifically rejected that methodology, criticizing it as "unsupported by the scientific community" and calling it "scientifically unreasonable."

However, USAA refused to consider the KCE Matrix report and relied on Haag's and EFI Global's report in denying Hillier's claim. USAA admittedly relied on Haag's

EFI Global's reports solely because they were consistent with USAA's preconceived decision regarding the Hillier claim --- that the residence was destroyed by storm surge. Under Mississippi law, USAA's reliance on unsubstantiated expert reports in denying Hillier's claim constituted bad faith.

A.    *January 11, 2006 Report by Haag Engineering Company.*

USAA hired Haag Engineering Company to determine which damage to Hillier's insured property was caused by wind and which was caused by storm surge. Kean Jenner of Haag issued a report to USAA dated November 11, 2005. A copy of the report is attached hereto as Exhibit A.

Jenner concluded in his report that the destruction of the Hillier home was caused by the storm surge:

> Storm surge water in this area consistently caused severe damage to all parts of dwellings at and below the water elevation. The wave action of the water imparted considerable force on portions of the dwelling below the water in areas closest the shore. . . In the case of the Hillier property, water eroded soil from beneath the dwelling and caused displacement of much of the very shallow foundation pedestals and some of the floor slab. Further, water rose about five feet on the property (about four feet inside the guest house and about three feet inside the main residence). **The water and waterborne debris battered the walls of the dwelling and contributed to its collapse . . . Properties nearest the water were subjected to flooding, wave action, and erosion well in advance of peak winds. By the time the hurricane came ashore, the involved house had already been flooded and battered by waves**.

Exhibit A at 5. However, Jenner's opinions were not based on substantial facts. Jenner testified that wave action was what destroyed the houses on the beach. Exhibit B, Dep. of Kean Jenner at 52. However, Jenner admitted that he did not know how high the waves were:

12    Q.  All right.  The second sentence of that
13   paragraph says, "The wave action of the water imparted

        14   considerable force on portions of the dwelling below the
        15   water level in areas closest to the shore."  How high were
        16   the waves at the Hillier residence?
        17       A.  I don't know.

Id. at 61.  Accordingly, Jenner's opinions regarding wave action were entirely unsubstantiated and speculative.

        The major basis for Jenner's theory that storm surge destroyed the Hillier residence was not based on unsubstantial facts.  Jenner opined that the destructive force of the storm surge arrived before hurricane winds so that the residence was "subjected to flooding, wave action, and erosion well in advance of peak winds."  Jenner opined that "by the time the hurricane came ashore, the involved house had already been flooded and battered by waves." Exhibit A at 5.  When asked where he got his weather data for this report, Jenner testified that he obtained his information from another engineer at Haag. Exhibit B at 28-29.

        In fact, Jenner was entirely wrong about the timing of the surge and the wind.  All of the meteorologist experts in this case, both plaintiff's expert and defendant's experts, agree that the storm surge did not even reach the Hillier property until *after* the peak hurricane winds.  *See, i.e.*, Exhibit C, Expert Report of Barry Keim at Table 1.

        The Haag report opined that, at its maximum height, the storm surge was approximately five feet deep on the Hillier property. Exhibit A at 5.  A table prepared by USAA's meteorology expert, Barry Keim, shows that the maximum surge occurred the Hillier property at 11:00 a.m. Id. The table shows that the peak hurricane winds battered the Hillier property for approximately three hours --- from 7:00 a.m. to 9:45 a.m. ---prior to the arrival of the storm surge on the property. Id.  The table reflects that, due to high

elevation of the property[2] the storm surge did not even reach the Hillier property until sometime between 9:00 and 10:00 a.m.  Accordingly, there are no facts which support Haag's theory that the storm surge destroyed the Hillier home prior to the arrival of peak hurricane winds.

Haag's report offered no reasonable basis for its conclusion that water, not wind, destroyed the Hillier residence.  At his deposition, Jenner listed three facts to support his theory that the storm surge destroyed the Hillier residence: (1) the erosion of the ground around the pedestals supporting the foundation;  (2)  the height of the debris pile, which indicated wave action; and (3) the condition of roofs on nearby houses. Exhibit B at 64-65.  Regarding erosion, that would have obviously occurred *after* peak winds since, according to USAA's own meteorology experts, there was not even one inch of storm surge on the Hillier property until after 9:00 a.m. that morning.  If hurricane winds had destroyed the Hillier home prior to the arrival of the storm surge, the erosion around the remaining pillars would not matter. Therefore, this theory is unsubstantiated and does not support Haag's conclusion that the storm surge, and not the wind, destroyed the Hillier residence.

Jenner could not explain how the debris pile supported his theory that storm surge destroyed the Hillier residence. Exhibit B at 68.  Jenner opined that the fact that the storm surge created a debris pile four or five feet high indicated that wave and water action was present on the property. Id. However, he did not know how high the waves actually were. Id.  Jenner said the "debris pile" theory was not subject to engineering calculation but was just "common sense." Id. at 67.  Accordingly, the "debris pile" theory is entirely unsubstantiated.  Moreover, the debris pile/wave action theory would not support

---

[2] USAA admits that the Hillier property was at least 22 feet above mean sea level.

Jenner's theory that the storm surge destroyed the Hillier residence since the wave action would make no difference if the hurricane winds had destroyed the house prior to the arrival of the storm surge.

The only support that Jenner offered for his theory that the wind did not destroy the Hillier residence was his interpretation of wind damage to nearby houses that survived the storm. Jenner testified that he applied the Enhanced Fujita Scale to the observed damage nearby to determine the amount of damage to the Hillier residence:

```
 9   Q.  Okay.  Explain that part to me.  What
10   engineering principles did you apply to evaluate the
11   magnitude of the wind?
12       A.  There is a hierarchy of damage caused by wind.
13   It's a well-established hierarchy.  It is reflected most
14   recently in one of the most current and updated standards
15   in the Enhanced Fujita Scale, which I might add, Tim
16   Marshall helped write.  And it has a hierarchy of damage
17   that a dwelling or structure will go through in response
18   to wind.  Okay.  And it's a very well-defined hierarchy,
19   and it is discussed in our report in brief.
20        And, basically, you have loss of roofing
21   materials and have loss of more roofing materials; you
22   have loss of vinyl siding at about that same wind speed;
23   you then have loss of awnings, lightly-constructed
24   structural elements.  It then progresses to loss of
25   decking; it then progresses to -- coincident loss of more
 1   substantial sidings, like plywood-type sidings.  And, only
 2   after that, and well after that, does it progress to
 3   actual structural damage.
 4        Usually, it consists of lifting of the roof
 5   structure off the walls, at which point, the entire
 6   dwelling will collapse.  Occasionally, it consists of
 7   lateral racking of the dwelling.  This hierarchy, by
 8   looking at the damage to a structure and seeing where it
 9   is on this hierarchy, you can then figure what the
10   destructive force of the wind was.  You can actually gauge
11   the wind speed, not to a particular mile per hour, but you
12   can certainly put it in a range, and that is, in fact, the
13   methodology used to gauge wind forces in a tornado.
```

14  This was developed for tornado effects because
15 there's rarely ever any actual meteorological evidence
16 associated with a tornado.  The wind forces and the rating
17 of the tornado is back figured from the structural damage
18 hierarchy, and that is sound engineering to do that.  And
19 that's basically the methodology applied with respect to
20 examining surrounding buildings and inferring from that
21 what the probable effect of wind forces on this dwelling,
22 which had been destroyed, were.
23  Q.  Okay.  And the Enhanced Fujita Scale, I just
24 Googled that, and it came up on the internet.  It shows
25 for different kinds of buildings the effect that winds at
1 certain speeds -- the effect that it would have on that
2 type of building; is that correct?
3  MR. THOMPSON:  Tina, we're going to have to
4  object to that question.  We're not going to allow
5  computers to be used during depositions.
6  Q.  (By Ms. Nicholson)  Okay.  Well, is that your
7 understanding of what's in the Enhanced Fujita Scale?
8  MR. THOMPSON:  You know I'm just kidding.
9  A.  If you could repeat that, please.
10  MR. THOMPSON:  His lawyer here is getting
11  bored, so he had to ask some questions.
12  Q.  (By Ms. Nicholson)  Okay.  Is the Enhanced
13 Fujita Scale available on the computer to anyone?
14  A.  Yes.
15  Q.  Okay.  And it describes for different types of
16 buildings the effects that certain wind speeds would have
17 on that type of building, generally.  Is that a fair
18 statement of the Enhanced Fujita Scale?
19  A.  That's fair.
20  Q.  In a tornado, correct?
21  A.  Yes, but the same principles apply to any wind
22 forces.

Exhibit B at 83-85.  However, USAA has expressly rejected this particular use of the

Enhanced Fujita Scale as "simply unsupported in the scientific community."  USAA's

Memorandum in Support of Motion to Exclude Expert Testimony of Neil B. Hall

[Document 82] at 10.  USAA asserted that "the EF Scale is not designed to establish the

damage level of a specific building from a specific windspeed, and if used in this manner,

it is likely to give results with a gross error." Id.  USAA has argued to this Court that Jenner's use of the EF Scale is "scientifically unreasonable." Id. at 11.  USAA has asserted that the EF Scale varies with the construction quality of the building, so that it would be necessary to know the construction details of the building in question. Id. at 12. Accordingly, USAA cannot have accepted Jenner's reasoning that he was able to determine the amount of wind damage to the Hillier residence simply by evaluating wind damage to surrounding structures that survived the storm.  USAA must have rejected that analysis out of hand.

To summarize Haag's November 2005 report, it contained no substantial facts supporting its conclusion that storm surge destroyed the Hillier residence.  As grounds for its conclusion, the report relied on two non-facts:

(1) *No facts supported Haag's opinion that the storm surge entirely destroyed the Hillier property prior to the arrival of peak winds.*  USAA was not entitled to rely on Haag's opinion in this regard as it was based on flawed weather information which USAA's own meteorologists proved was not true.  Moreover, the destructive forces of the storm surge were entirely moot if wind had already destroyed the house prior to the arrival of the surge.

(2) *Haag's interpretation of wind damage to nearby homes which survived the storm relied on methodology rejected by USAA.*  USAA could not  rely on Haag's Enhanced Fujita Scale analysis in this regard as it is, in USAA's own words, "scientifically unreasonable."  USAA cannot in good faith rely on an analysis that it has rejected and discredited.  Therefore, there was no substantiation for Haag's opinion that the wind did *not* destroy the Hillier residence.

USAA could not in good faith decide, without more, that the wind did not destroy the Hillier house. USAA could accept Haag's theories that the storm surge, when it eventually got there, could have destroyed the house had it still been there. However, USAA could not assume, without substantiation, that the wind did not destroy the house prior to the arrival of the storm surge.

Under Mississippi law, an insurance company cannot rely on the opinion of an expert to deny an insurance claim if the expert's opinion is not substantiated. Haag's November 2005 report is not substantiated in any way by actual facts or scientific reasoning. USAA relied on Haag's unsubstantiated opinion that the storm surge arrived prior to the peak winds and destroyed the Hillier residence. USAA further relied on an opinion by Haag --- that the wind did not destroy the Hillier residence --- which Haag reached using an analysis which USAA itself has rejected and discredited. Accordingly, USAA's reliance on this report was unreasonable.

**B.    January 11, 2006 Report by EFI Global**

USAA also hired EFI Global to produce an engineering report regarding the Hillier residence. Michael Hummel, an EFI Global engineer, authored a report[3] to USAA dated January 11, 2006. Exhibit D. In that report, Hummel opined that "[a]ll available evidence indicated that storm surge and wave action forces were responsible for the structural failure of the main residence. Id. at 1. Hummel wrote that "All evidence observed at this site indicated that storm surge and wave action forces were responsible for the structural collapse of the subject main residence." Id. at 4.

Hummel based his theory that storm surge destroyed the Hillier residence on his erroneous belief that the storm surge achieved destructive potential on the Hillier

---

[3] Hummel authored the report and Lori Cox peer reviewed it. Exhibit E at 11.

property prior to the arrival of peak hurricane winds. Hummel testified at his deposition

that he knew that the storm surge destroyed the Hillier residence before the maximum

winds arrived because the house's roof slopes would have exhibited more severe wind

damage had they not already been on the ground at the time of maximum wind speeds:

```
13    A.  Okay.  My expert opinion is that the water
14    action that occurred at this site was sufficient to
15    destroy this structure prior to the maximum winds that
16    have since been reported occurred and that is stated
17    on the fact that -- we've gone over this in great
18    detail, but the roof covering available, the weakest
19    portions of the primary structure were not damaged in
20    a manner consistent with wind, which the most rational
21    explanation for that that exists is that they were
22    down prior to those winds that could have damaged them
23    or they were somehow protected by the height of the
24    water and other factors.
25    Q.  Okay.  Good.  That's an important point of
 1 qualification.  So it's your opinion that the house
 2 was actually destroyed or collapsed due to storm surge
 3 prior to the peak winds arriving; is that right?
 4    A.  Yes, that is my understanding based on the
 5 evidence.  Yes.
```

Exhibit E at 121-122.  Hummel reiterated this point several times. Id. at 62-63 and 90.

Despite the fact that Hummel premised his entire theory on the early arrival of the storm

surge, he had no idea what time the surge arrived at the Hillier property. Id. at 34.

As discussed above, USAA's own meteorologist established that the peak winds

of the storm (87-106 mph)[4] battered the Hillier residence for approximately three long

hours before the storm surge even reached the Hillier property. Exhibit C at Table 1.

---

[4] Hillier's meteorologist agrees with that time frame, but puts the wind speeds higher.

Accordingly, no facts supported EFI Global's theory that the storm surge destroyed the

Hillier residence prior to the arrival of the peak winds.[5]

Like Jenner, Hummel testified that he believed wind did not destroy the Hillier

residence because he did not observe severe wind damage to nearby structures that

survived the storm. Id. at 56. Like Jenner, Hummel testified that he used the Enhanced

Fujita Scale for that analysis:

> 18    Q.   And I may have asked this, but do you know
> 19  how high the wind speeds peaked out at Hurricane
> 20  Katrina at the Hillier residence?
> 21     A.   Again, I don't sitting here, but in talking,
> 22  going -- I do have a guess now.  It kind of came as I
> 23  was answering the previous question, but I do recall
> 24  that the storm made landfall basically at a category
> 25  three level, which would have put the maximum wind
> 1  speeds from around 110 to 130 miles an hour.
> 2    Q.   At 110 miles per hour, what kind of shingle
> 3  damage, if any, would you expect to see on a roof
> 4  covering?
> 5    A.   You'd expect to see pretty catastrophic
> 6  damage at 110 miles an hour, large portions of
> 7  shingles removed.  You'd even get up to decking
> 8  removed at that point in time.
> 9    Q.   And what do you base that on?
> 10    A.   I don't know that -- I believe it's called
> 11  the Fujita scale.  I reference it when I do tornadoes
> 12  and other wind related losses.  There's basically a
> 13  chart that shows what damages can be expected to a
> 14  properly constructed building at different wind speed
> 15  ranges.
> 16    Q.   Okay.  And this is the Fujita scale that you
> 17  use, or is it the enhanced Fujita scale?
> 18    A.   I don't know.
> 19    Q.   And that would be the scale for one or two
> 20  family residential buildings?
> 21    A.   Yes.
> 22    Q.   And that's a tool for assessing tornado
> 23  damage, correct?
> 24    A.   General wind speed damage is -- it is

---

[5] Lori Cox, the engineer who reviewed and stamped the report, agreed that the peak winds could have arrived prior to the peak storm surge. Exhibit G, Dep. of Lori Cox at 45-47.

```
25   applicable for straight line winds, as well.  I
 1   believe it was -- well, I know it was originally
 2   created in reference to tornado activity.
 3       Q.   And you use it for hurricanes, as well,
 4   straight line winds?
 5       A.   Yes.
```

Exhibit E at 56-58. As discussed above, this is very analysis that USAA has expressly discredited and rejected as "scientifically unreasonable" and "unsupported by scientific evidence." Therefore, it would have been unreasonable for USAA to rely on that analysis as a basis for denying Hillier's claim.

To summarize EFI Global's January 2006 report, it contained no substantial facts supporting its conclusion that storm surge destroyed the Hillier residence. As grounds for its conclusion, the report relied on two non-facts:

(1) *EFI Global incorrectly stated that the storm surge destroyed the Hillier property prior to the arrival of Katrina's peak winds.* USAA was not entitled to rely on EFI Global's opinion in this regard as it was based on flawed weather information which USAA's own meteorologists proved was not true. USAA's experts proved that the hurricane's peak winds battered the Hillier residence for three hours prior to the arrival of the storm surge on the Hillier property.

(2) *To support its opinion that wind did not destroy the Hillier residence, EFI Global interpreted w*ind *damage to nearby homes which survived the storm using methodology rejected by USAA.* USAA could not  rely on EFI Global's Enhanced Fujita Scale analysis in this regard as it is, in USAA's own words, "scientifically unreasonable." USAA could not in good faith rely on an analysis that it has rejected and discredited.

There was no substantiation for EFI Global's opinion that the wind did *not* destroy the Hillier residence. USAA could not in good faith decide, without more, that the wind did not destroy the house. USAA could accept EFI Global's theories that the storm surge, when it eventually got there, could have destroyed the house had it still been there. However, USAA could not assume, without substantiation, that the wind did not destroy the house prior to the arrival of the storm surge.

Under Mississippi law, an insurance company cannot rely on the opinion of an expert to deny an insurance claim if the expert's opinion is not substantiated. EFI Global's January 2006 report is not substantiated in any way by actual facts or scientific reasoning. USAA relied on EFI Global's unsubstantiated opinion that the storm surge arrived prior to the peak winds and destroyed the Hillier residence. USAA further relied on an opinion by EFI Global --- that the wind did not destroy the Hillier residence --- which EFI Global reached using an analysis which USAA has rejected and discredited. Accordingly, USAA unreasonably denied the Hillier claim.

### C.     *March 2006 Report by KCE Matrix*

Hillier hired KCE Matrix to evaluate the cause of damage to her residence. Vahe Kardjian, an engineer at KCE Matrix authored a report dated March 20, 2006. Exhibit F, KCE Matrix Report. Kardjian opined that Katrina's peak winds arrived hours ahead of the storm surge. Id. at 5.   That was consistent with the opinions of USAA's own meteorologist. Exhibit C at Table 1.

Kardjian wrote that the age of the Hillier residence made it extremely susceptible to wind load damage. Exhibit F at 5.  This is consistent with the opinion of Lori Burke Cox, USAA's engineering expert. Cox conceded that the Hillier main residence was built in the early 1800s.  Exhibit G, Dep. of Lori Cox at 30.  Cox testified that she was familiar with the construction standards for residences in the 1800s in Mississippi. Id. at 50.  She testified that residences built in that era were "built to stand and that was it.  There were no construction standards."  Id.  She testified that the method of construction of a residence at that time was left up to the individual builder. Id.

Kardjian noted that a nearby residence, just three lots down the beach from the Hillier residence, had a lower elevation than the Hillier property.  Exhibit F at 5. Kardjian reported that this structure, although much more susceptible to the effects of storm surge than the Hillier residence because of the elevation, had survived the surge with only minor structural damage. Id.  Kardjian opined that, since the Hillier residence had a type of foundation that was less susceptible to storm surge, but had been destroyed, it supported his theory that wind destroyed the Hillier residence. Id. at 5.  Kardjian's opinion was that the "wind forces did arrive hours ahead of the storm surges and caused

tremendous damage and partial collapse" of the Hillier residence. Id. "The storm surges

then washed away the already collapsed structures." Id.

Kardjian's report was consistent with the true circumstances, as admitted by

USAA's own meteorologist --- that the peak winds arrived at the Hillier residence hours

prior to the arrival of the storm surge. *See* Exhibit C at Table 1.  USAA's own expert

further agreed with Kardjian that older structures were unlikely to have been built to any

kind of standard.  Exhibit G at 50.

USAA, however, refused to consider Kardjian's report. Gary Taylor, USAA's

general adjuster on the claim, testified that he rejected Kardjian's report based on his own

personal opinion that older buildings were generally well-built. Exhibit G, Excerpt of

Dep. of Gary Taylor at 67.  Taylor rejected the reports of all experts who had the opinion

that the peak winds came before the storm surge. Id. at 68. Taylor testified that he did not

believe any reports of wind knocking down structures during Hurricane Katrina. Id. at 69.

Taylor testified that he did not believe that Katrina's winds knocked down any

structures because there were often other buildings nearby that did not have severe wind

damage. Id.  Of course, that methodology is the same analysis that Jenner and Hummel

used, and which USAA has rejected as "scientifically unreasonable."

Taylor testified that he did not know whether the information on which Haag and

EFI Global based their reports was reliable. Id. at 70.  He testified that he decided to rely

on those reports, however, and not that of KCE Matrix, merely because of his own

personal feelings about the cause of damage to the Hillier residence:

```
 9     Q.    Sure.  And where I'm going with this
10   is, you seem to have a fairly strong feeling that
11   Haag's and EFI's reports are reliable; whereas,
12   Mr. Kardijan or Biddy's or other reports that the
```

13  wind was of sufficient magnitude to destroy homes
14  before the tide got there is unreliable.  So I'm
15  trying to sort of explore where that feeling is
16  coming from, whether you prefer one group of
17  engineer's weather data over another group's
18  weather data.
19      A.    No, I can tell you where that's
20  coming from.  It's coming from my personal
21  observations on the Coast.  It -- you know, if I
22  read three reports, and I've been there and seen
23  it, for me, personally, I'm going to -- I'm going
24  to ferret out the facts that seem to make sense to
25  me, if you want to boil it down to that level.
1            I'm not a weather expert, I'm not an
2  engineer.  But I've been in this business -- next
3  month will be 32 years.  And so I'm not
4  downplaying the -- my own experience in working --
5  I've worked every major hurricane since Elena in
6  '85, and I've seen wind and -- I'm -- not just
7  hurricanes.  Tornadoes, hailstorms, all of it.
8            So I'm not, you know, holding myself
9  out as an expert, but I'm not downplaying my
10  experience, either.  And when I see a house here
11  on the beach that's a slab, and I see one the next
12  block back that's got three shingles off of it,
13  and I read three reports, you know, human nature
14  is going to tell me that I'm going to figure out
15  on my own which one makes the most sense to me.

Exhibit H at 71-72.  Taylor testified that Haag's and EFI Global's reports just "made

more sense" than a report that said the wind arrived before the storm surge:

4      Q.    Okay.  When we were -- we've kind of
5  segued back and forth.  You were talking -- I was
6  asking you about the basis for this comment about
7  -- you seemed to have a very strong bias toward
8  EFI and Haag's reports that flood destroyed the
9  buildings prior -- well, prior to significant wind
10  damage, and you seem to be discounting Biddy's
11  reports or the common thread and the "opinion," in
12  quotation marks, "that wind came before flood and
13  was of significant enough magnitude to completely
14  destroy the structure.  These opinions are widely
15  unsupported."  And I was asking you where that

16   comment came from, and you began discussing your
17   personal observations and experience.
18        A.    Right.  Well, first of all, I
19   wouldn't call it a bias.  I mean, it's an opinion.
20   I -- that's -- in my opinion, their reports, based
21   on what I saw on the Coast, make more sense to me.

Id. at 74. The document referenced in that testimony was an email from Taylor to his

manager at USAA regarding the Hillier claim, where Taylor disparaged the idea that

wind arrived before the storm surge:

> **The Kardijan [sic] report is woven with the common thread that we
> have been seeing in the Biddy reports and those of others, that is, an
> "opinion" that wind came before flood and was of significant enough
> magnitude to completely destroy the structure.  These opinions are
> widely unsupported.**

Exhibit I, Email from Gary Taylor to Jim Burke (May 31, 2007).  Taylor disparaged

Kardjian's theory that the wind came before the surge as a "quantum leap." Id.

     In fact, USAA's own weather experts agree that Katrina's peak winds hammered

the Hillier residence for three hours prior to the arrival of the storm surge on the property.

*See, i.e.*, Exhibit C at Table 1.  Accordingly, Taylor had no substantial basis for rejecting

the KCE Matrix report out of hand.  Taylor accepted and agreed with the Haag and EFI

Global reports, although unsubstantiated, solely because they mirrored his preconceived

opinions about the cause of damage to the Hillier residence.

**D.     February 1, 2007 Report by Haag Engineering Company.**

     USAA asked Haag to rebut the KCE Matrix Report. Jenner wrote a second report

dated February 1, 2007. Exhibit I, Second Haag Report.

     In its analysis of the KCE Matrix Report, Haag once again used the Enhanced

Fujita Scale to support its opinion that the wind damage to the Hillier residence would

not have exceeded the wind damage observed to nearby structures. Id. at 5-6. Of course, this is the same methodology expressly rejected by USAA as "scientifically unreliable."

Regarding Kardjian's opinion that the age of the Hillier residence made it more susceptible to wind damage, Haag opined that the mere fact that the residence had withstood Hurricane Camille was "proof" that the residence was well built. Id. at 6-7. However, at his deposition, Jenner admitted that he did not know the exact wind speeds at the Hillier property during Camille, nor how high the surge was at the Hillier property during Camille. Exhibit B at 95-96. Therefore, no facts supported Jenner's opinion that the Hillier residence survived higher winds in Camille than in Katrina.

To summarize, Haag's February 2007 report, which disparaged the KCE Matrix report, contained no substantial facts supporting its conclusion that the KCE Matrix opinions were flawed. Haag criticized the KCE Matrix report on two main points:

1.    *Haag disagreed that the wind came before the water and substantially damaged the Hillier residence.* Haag discredited this theory by using the Enhanced Fujita Scale analysis, which assumed that the wind damage to the Hillier residence would not be greater than the wind damage to nearby structures which survived the storm. However, that is the very analysis which USAA itself rejected as "scientifically unreasonable." Therefore, USAA could not reasonably rely on Haag's opinion in that regard.

2.    *Haag disagree that the age of the structure made it more susceptible to wind damage.* Haag rejected KCE Matrix's opinion that the lack of construction standards in the 1830's when the house was constructed made the house more susceptible to wind damage. Haag based its opinion entirely on the assumption that the house had endured higher winds, and less storm surge, during Hurricane Camille. However, Haag did not

know the wind speeds at the Hillier residence during Camille, nor the level of the surge during the storm. Therefore, that opinion was unsubstantiated.

Under Mississippi law, an insurance company cannot rely on the opinion of an expert to deny an insurance claim if the expert's opinion is not substantiated. Haag's February 2007 report was not substantiated in any way by actual facts or scientific reasoning. USAA relied on Haag's unsubstantiated opinions that the KCE Matrix report was invalid. USAA accepted Haag's unsubstantiated opinions because they were the same as USAA's own preconceived ideas. Accordingly, USAA was unreasonably in rejecting the KCE Matrix report and denying the Hillier claim.

**E.      February 13, 2007 Report by EFI Global**

USAA asked EFI Global to rebut the KCE Matrix report. Lori Cox wrote the report, dated February 13, 2007. Exhibit K, Second Report of EFI Global.

In this report, Cox reaffirmed EFI Global's opinion from the first report that the peak storm surge arrived at the property prior to the hurricane's peak winds:

> It is also our opinion based on the weather data available and the evidence observed that the strongest winds from Hurricane Katrina reached shore *after* the peak storm surge associated with the hurricane. This opinion is based upon evidence observed on-site, in the vicinity of the subject loss property and the unique characteristics of the storm. . . . The KCE Matrix report maintained that water could not possibly have caused this damage, primarily because the windstorm forces occurred prior to the floodstorm forces. However, finalized date from the National Weather Service addressed later in this report illustrate the storm surge arrived well before the winds of Hurricane Katrina.

Exhibit K at 2 (emphasis in the original). Therefore, the main reason that Cox rejected the KCE Matrix report is because of her belief that the storm surge destroyed the Hillier residence prior to the arrival of peak winds.

Cox went on to state that she had no idea how high Katrina's winds actually were:

> Accurate weather data in close proximity of this site is not available.  It simply does not exist. . . [T]herefore, we acknowledge there are no measurements indicating the ultimate speed and directions of the winds from Hurricane Katrina at the peak of the storm in the area of loss.

Id.  Cox went on to say that, since the wind speeds were unknown, "one simply cannot say that the wind speeds were such to cause extensive and catastrophic structural damage to any specific dwelling as alleged in the KCE Matrix report."  Id.  Cox, however, did not address the opposite proposition --- that, since the peak wind speeds were unknown, one could not say that the wind speeds were *not* such as to cause extensive and catastrophic structural damage. Cox relied entirely on her theory that the storm surge arrived at the Hillier residence and destroyed the house before the peak winds occurred, evidently assuming that the wind speed was a moot point.

In fact, Cox specifically stated that her main reason for rejecting the KCE Matrix report was her belief that the storm surge arrived prior to peak winds:

> Further review of the wind graphs provided does not indicate winds over 100 miles per hour until 1500 UTC (10:00 a.m.) on August 29, 2005. These documents indicate that the storm surge arrived well ahead of the maximum sustained winds and gusts of any substantial measurement. **This alone refutes any conclusion that high hurricane force winds caused significant damage to the Hillier dwelling prior to the arrival of storm surge. In fact, the storm surge arrived before winds of any substantial strength.**

Id. at 5 (emphasis added).  Cox believed that the storm surge arrived at the Hillier residence partly because she did not bother to find out the elevation of the house.  EFI Global's first report states that, "According to the insured the elevation of the first floor was approximately 17 feet above mean sea level."  Exhibit D at 2.  Cox admitted that she never bothered to check the elevation of the residence. Exhibit G at 19.   As a matter of fact, USAA's own meteorologist, Barry Keim, placed the general elevation of the

Hillier's land at approximately 22 feet based on FEMA flood maps. Exhibit L, Excerpt of Dep. of Barry Keim at 6.

In EFI Global's second report, Cox noted that her information "shows the storm surge approaching 9 feet above mean sea level at approximately 2:00 a.m. Central Standard Time. This is clearly approximately 5 hours before winds in the region of 75 miles per hour are displayed on the . . . graph." Exhibit K at 6. Cox obviously calculated that the storm surge was on the Hillier property by 2:00 a.m. Cox failed to consider that the elevation of the Hillier property was at least 22 feet above mean sea level, mainly because Cox had never bothered to find out the true elevation of the property. She merely assumed that, because the property was beachfront, it had a very low elevation.

Cox rejected the KCE Matrix report primarily because it was not consistent with her theory that the surge arrived on the property prior to significant winds:

> To assume the winds from the subject event arrived prior to the storm surge . . . would be remiss. . . . EFI respectfully maintains that the Hillier residence was damaged primarily by the storm surge from Hurricane Katrina prior to the arrival of the winds associated with Hurricane Katrina.

Id. at 7. However, no facts supported Cox's theory that the peak storm surge occurred "well in advance" of peak winds. At her deposition, Cox admitted that she did not know whether the peak winds or peak storm surge arrived first at the Hillier residence. Exhibit G at 45-47. When confronted with the expert report of USAA's own meteorologist, Donald Slinn, who opined that the peak winds arrived before the storm surge, Lori Cox admitted that "it could have happened that way." Id. at 46. She testified that she had no reason to disagree with Slinn's opinion about the timing of the wind and the storm surge at the Hillier residence. Id. at 47. All Cox could testify to as to the timing of the wind and the storm surge is that they both arrived at the Hillier residence "close to the same

time." Id. at 46.  Faced with the actual facts, Cox completely abandoned her theory that the peak storm surge arrived far in advance of the peak winds.  Therefore, no facts supported Cox's theory that the storm surge destroyed the Hillier residence prior to the arrival of peak winds.

In the second EFI Global report, Cox also rejected KCE Matrix's suggestion that the almost 200 year old building was particularly susceptible to Katrina's winds because she believed that the building had survived higher winds in Hurricanes Camille and Elena. Exhibit G at 6.  She stated that [h]ad the manner of construction or age of the residence been a contributing factor, the subject residence would not have withstood the Category 5 winds of Hurricane Camille."  Id. However, Cox admitted that she did not know how high the winds were at the Hillier property during Hurricanes Camille and Elena, nor the height of the storm surge at the Hillier property. Exhibit G at 50-51.

Cox also admitted that the Hillier residence was likely poorly constructed in comparison to today's standards.  Cox conceded that the Hillier main residence was built in the early 1800s.  Id. at 30.  Cox testified that she was familiar with the construction standards for residences in the 1800s in Mississippi. Id. at 50.  She testified that residences built in that era were "built to stand and that was it.  There were no construction standards."  Id.  She testified that the method of construction of a residence at that time was left up to the individual builder. Id.  Accordingly, no facts supported Cox's theory that the house was strong enough to withstand a Category 5 hurricane.

Cox also suggested that the house was destroyed by three storm surge forces: hydrostatic force; hydrodynamic force; and wave action.  However, no facts supported that theory.  Cox testified that a hydrostatic force is "a lateral force exerted on the wall

due to the weight of the water pushing on the wall." Exhibit G at 52.  The calculation

assumes that there is no water on the other side of the wall. Id. at 53.  However, Cox's

reports do not state any facts which indicate why the water would have risen outside of

the Hillier residence without also rising inside the residence.  In fact, Haag's first report

stated that there was three feet of water inside the residence, which would have elimated

the hydrostatic force. Exhibit A at 6.

Cox described hydrodynamic force as "the force of moving water on an object."

Exhibit G at 52.  Cox testified that "hydrodynamic forces are going to vary based on the

velocity."  Id. at 53.   However, Cox testified that she didn't know the velocity of the

storm surge at the Hillier residence during Hurricane Katrina. Id. at 52.   Without that

basic fact, Cox cannot support her theory that the hydrodynamic force of the storm surge

destroyed the Hillier residence because she cannot calculate the hydrodynamic force.

Cox's February 13, 2007 report states that "wave action and floating debris would

most likely exacerbate structural damage." Exhibit K at 5.  However, Cox did not know

how high the waves were at the Hillier residence. Exhibit G at 53-54.

Cox did not know how high the waves were at the Hillier residence partly because

her calculations were based on unbroken waves, while the waves at the Hillier residence

were breaking waves. Cox's January 11, 2006 report opined that "a wave can reach a

maximum height of 78% of the water depth before it breaks" and that, "[g]iven the 51-

inch still water depth and the fact that there was no major obstructions between this

property and the Gulf of Mexico it is likely that the waves in this area approached a

height of 7.5 feet." [6]

---

[6] Cox actually recanted that calculation at her deposition, stating that Hummel had calculated it wrongly, and testified that she thought the waves were actually five to six feet. Exhibit G at 24.

Cox testified that her calculation applied only to unbroken waves. Exhibit G at 23. She testified that she did not know whether the waves at the Hillier residence were breaking waves or unbroken waves. Id. at 25.  Cox testified that she had "no opinion on the waves if they were breaking."  Id at. 24.

USAA's own climatology expert, Donald Slinn, testified that the waves at the Hillier residence were all breaking waves. Exhibit M, Excerpt of Dep. of Donald Slinn at 183.  Since Cox testified that she had no opinions on breaking waves, her opinions that the wave action exacerbated structural damage to the residence are not based on any rational calculation of the wave height or force at the Hillier residence, and are purely speculative in nature.

To summarize EFI Global's February 13, 2007 report, it contained no substantial facts supporting its conclusion that storm surge destroyed the Hillier residence.  As grounds for its conclusion, the report relied on three non-facts:

(1)  *EFI Global incorrectly stated that the storm surge destroyed the Hillier property prior to the arrival of peak winds.*  USAA was not entitled to rely on EFI Global's opinion in this regard as it was based on flawed weather information which USAA's own meteorologists proved was not true.  Cox even admitted that that the hurricane's peak winds battered the Hillier residence for three hours prior to the arrival of the storm surge on the Hillier property.

(2)  *Without any basis in fact, EFI Global suggested that the Hillier residence was destroyed by hydrodynamic force, hydrostatic force, and wave action.*  Cox testified that she did not know the velocity of the storm surge, and thus could not calculate the hydrodynamic force. Cox testified that hydrostatic force came into play only if the water

outside the house was higher than the water inside the house,  when USAA's own experts stated that was not the case.  Cox testified that she did not know how high the waves were at the Hillier residence, and had no opinion about that.

(3) *Without any basis in fact, EFI Global stated that the Hillier house's age and construction did not make it susceptible to Katrina's winds because it had withstood higher winds in Camille and Elena.* Cox testified that she did not know how high the winds were at the Hillier residence during Camille and Elena. She further testified that houses built during the time of the Hillier residence's construction were "built to stand and that was it."

Under Mississippi law, an insurance company cannot rely on the opinion of an expert to deny an insurance claim if the expert's opinion is not substantiated. EFI Global's February 2007 report was not substantiated in any way by actual facts or scientific reasoning.  USAA relied on EFI Globals' unsubstantiated opinions that the KCE Matrix report was invalid.  Accordingly, USAA unreasonably rejected the KCE Matrix report and denied the Hillier claim.

### F.    Conclusion

The Mississippi Supreme Court has established that insurance companies may not deny claims based on expert opinions if the facts do not substantiate the expert's opinions.  In this case, USAA denied Honora Hillier's claim in reliance on the reports of Haag and EFI Global.  USAA relied on the Haag and EFI Global reports despite the fact that they relied on flawed meteorological assumptions which USAA's own experts proved were wrong.  USAA relied on the Haag's and EFI Global's opinions that wind did not destroy the Hillier residence despite the fact that they relied on a methodology which

USAA specifically rejected and criticized as "scientifically unreasonable."  USAA relied

on the Haag and EFI Global reports despite the fact that they rejected the KCE Matrix

report for reasons which turned out later not to be true.

As evidenced by the testimony of Gary Taylor, USAA rejected the KCE Matrix

report and relied on the  Haag and EFI Global reports solely because the latter two agreed

with USAA's preconceived opinion that storm surge destroyed the Hillier residence prior

to the arrival of peak winds. Such conduct constitutes bad faith under Mississippi

insurance law.

USAA may argue that it was not aware that Haag's and EFI Global's

meteorological assumptions were incorrect until USAA hired meteorological experts in

this lawsuit.   However, an insurance company's good faith duty to promptly pay a claim

does not end when a lawsuit is filed. Anthony v. State Farm Fire and Cas. Co., 2009 U.S.

Dist. LEXIS 104398 S.D. Miss. (Nov. 4, 2009).  USAA should have paid Hillier's claim

as soon as USAA realized that its expert reports were unreliable.

There is at least a genuine issue of material fact as to whether USAA acted in bad

faith in denying full and prompt payment of Honora Hillier's claim, based on its reliance

on reliable expert reports.   USAA's Motion for Partial Summary Judgment should be

denied.

### ***III.***     ***Additional Living Expenses***

Sherry Conquest, USAA's 30b6 representative regarding ALE coverage, testified

about USAA's policy regarding ALE coverage:

```
19    Q.  And how long is ALE available to the member?
20    A.  It's a contractual 12 months.
21    Q.  When you say it's a contractual ten months what's
22    that mean?
```

23    A.  Twelve.  I mean in the policy it states that we
24  will give them additional living expense for 12 months.
25    Q.  Does it have anything to do with the length of
1  time it takes to repair the residence?
2    A.  It does if it's under the 12-month period.
3    Q.  And how does that work?
4    A.  If it takes six months to repair the dwelling
5  then we would pay incurred additional living expense for
6  six months.
7    Q.  Now, what about in a case such as the Hilliers
8  where there's actually two perils that contributed -- or
9  let me take that back.  Strike that.  Let me start over.
10  What about in a case such as the Hilliers where USAA
11  believes that there are two perils which caused
12  destruction to the home, one of which is covered and one
13  of which is excluded, wind and flood, and how does the
14  ALE -- how is that calculated then?
15    MR. THOMPSON:  We actually liked the first
16  question.  It was more accurate.
17    A.  Well, I'm not even going to address that, but
18  what we did in this instance with the Katrina losses is
19  we gave the member additional living expense until we
20  determined what the actual cause of the loss was, so if
21  the loss happened in September or August and we found
22  out in February from the engineer's report that the
23  majority of the damage was to wind or flood, depending
24  on which one it was, then we paid the additional living
25  expense until the report came in regardless of the
1  damage, regardless of what the cause of the loss was.
2    Q.  And what about when the report came in?
3    A.  Once the report came in, it depends on what the
4  report said.  Then we determined additional living
5  expense after that.
6    Q.  And how do you do that?
7    A.  For the covered loss, the time it would take to
8  repair the dwelling up to the 12-month period.
9    Q.  How long would it take to repair the damage
10  caused solely by the covered loss?
11    A.  That's correct.

Exhibit N, Excerpt of Dep. of Sherry Conquest at 36-38.  Conquest testified that USAA

cut off ALE coverage when after the amount of time it would have taken the insured to

repair the damage caused solely by the covered peril.  Id.  In this case, USAA cut off

Hillier's ALE coverage prematurely since USAA underestimated the covered loss and the amount of time it would have taken to repair the covered loss. Since USAA informed Hillier that her ALE expenses would no longer be covered, she avoided incurring ALE expenses to which she was actually properly entitled. Hillier would have incurred ALE expenses for a longer period of time had she known they would have been covered. USAA cannot profit from its bad conduct. By advising Hillier that no further ALE would be covered, USAA prevented Hillier from incurring further ALE. USAA now asserts that Hillier cannot recover additional ALE because she failed to incur it. Hillier only failed to incur ALE because she relied on USAA's misrepresentations and lived below her usual standard of living in order to reduce her incurred ALE. Hillier is entitled to recover the ALE which she would have incurred had USAA not misled her. Hillier is entitled to recover the policy limits of her ALE coverage.

WHEREFORE, PREMISES CONSIDERED, Honora Hillier requests the Court to deny USAA's Motion for Partial Summary Judgment.

Respectfully submitted this the 30th day of November, 2009.

HONORA HILLIER,
Plaintiff

BY: */s/ Tina L. Nicholson*
TINA NICHOLSON, MSB#99643

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned counsel, do hereby certify that I have this day filed a true and

correct copy of the foregoing document with the CM/ECF system which will send a copy

to the following counsel of record:

> Robert P. Thompson
> Charles Copeland
> Copeland, Cook, Taylor & Bush
> P.O. Box 6020
> Ridgeland, MS 39158

This the 30th day of November, 2009.

BY: <u>/s/  Tina L. Nicholson</u>
TINA L. NICHOLSON, MSB#99643

MERLIN LAW GROUP
Three Riverway, Suite 1375
Houston, Texas 77056
Telephone: (713) 626-8880
Facsimile:  (713) 626-8881